Case number 14-112, Deborah Morabito v. Roger Holmes et al. We're arguing this not to exceed 15 minutes per side. Mr. Baisweiss for the appellants. Good morning to the panel, court staff, my colleagues and spectators in the room. My name is John P. Baisweiss, Jr. If you ever meet me socially, please feel free to call me Jack. I'm an attorney with the City of Cleveland in the Law Department, and I represent the appellants Roger Holmes and Joseph Rauscher. If I may, this case really comes down to two separate issues. One is denial of access to medical care, and one is an allegation of excessive force. And if I may, I'd like to start with the denial of access to medical care, because I think it is a simpler issue to address first. The Sixth Circuit has previously held in the Napier case, which I refer to in my briefing, that in order to prove a denial of access to medical care claim when the medical care was delayed, and in this case the medical care was delayed. There's no dispute that Mr. Morabito received medical care at the Cleveland City Jail at approximately 7.50 p.m., which is about 24 minutes after the alleged excessive force incident happened. In that case, in order to prove your claim, you must show both an objective and subjective component. In order to show the objective component, you must produce evidence in the record that the delay in receiving medical care substantially aggravated the illness or injury to the party claiming the violation. And there is no evidence in the record regarding the delay in his receipt of medical care causing any sort of aggravation to the injuries that Mr. Morabito claims, let alone substantial aggravation. And as I said before, this court has required that in Napier, which I believe is a 2001 case. If you don't have any questions on that, I can move on to the excessive force issues. Go for it. Thank you. When it comes to excessive force, there are three different portions that we have to deal with. And to take them chronologically, it's that simple. I'm sorry, I think the simplest way. The first involves my client Roger Holmes. When he entered Mr. Morabito's cell, and this is shown on video that I'm sure everybody has seen, and he testified that Mr. Morabito was threatening to him and was in a manner where he was between Mr. Holmes and the cell door. And after Mr. Morabito got up into his face, Officer Holmes shoved him to the ground in order to get out of the cell safely. And while it may not be pretty, I believe that it is objectively reasonable for a corrections officer who's dealing with somebody who's obviously been arrested, no determination of guilt or anything of that nature, but it's reasonable to believe that they were arrested because of some sort of malfeasance. And he felt that he was threatened. He testified to that. And whether he was right or wrong under qualified immunity, it's whether he was objectively reasonable. And I believe that he was objectively reasonable in his single shove to move Mr. Morabito out of the way so he could safely get out of the cell. And also, it – I'm sorry, I'm searching for the word. Is that the kind of thing, though, that juries are asked to do, figure out whether the shove was necessary under the circumstances or cross the line? It can be, Your Honor, when there isn't sort of a clear case law on this in terms of how use of force has been upheld to be reasonable in other situations. And we believe that – I'm sorry, I believe that I've cited to a number of cases in my briefing where greater uses of force were held to be objectively reasonable by courts. And therefore, because of that, since it is clearly lesser force, it is not proper to be a jury question. It should be a legal question. So one case that I would point to right away is – and it's, I think, one of my strongest cases in this matter, even though, unfortunately, it's not out of the circuit – the J.B. X. Earl Brown v. Amerson case, which is out of the Eleventh Circuit. In that case, there was a 14-year-old who was not convicted of a crime and, in fact, was in a program for juvenile delinquents where he, again, was not considered a convict or anything of that nature. And what he did was he put himself in a situation where the corrections officer believed he was about to be spit on. Now, being spit on is a big part of the second allegation of excessive force in this case, but I think that the provocation is somewhat irrelevant in terms of when you compare it to the force that was used. In the J.B. case, again, we're talking about a 14-year-old child here. The corrections officer applied a chokehold, and this was caught on video. And the chokehold was held onto the complainant, the plaintiff, J.B., for 19 to 20 seconds. And the Eleventh Circuit upheld that as a matter of law, that was not excessive force given the circumstances, that the corrections officer believed he was going to be spit on. And in the video, it showed that prior to this chokehold being applied, J.B.'s interaction with Amerson, the corrections officer, was actually rather mundane, calm, no real prior fighting before the chokehold was applied. And I think that the J.B. case actually can be applied to not only the initial shove, but also obviously to the second portion where my client, Officer Rauscher, I'm sorry, Lieutenant Rauscher, used an open hand to mug or shove Mr. Morabito's face. Do you claim that there's no evidence that he tasered him? Your Honor, when we get to the third part of the brief, there are two issues. We claim that there is not sufficient evidence that he was tasered. But we further claim that the internal report is an admissible hearsay. Why isn't it a business record? Because it is not a record that keeps... You say nothing of an admission against interest. None of the people who make those admissions are the parties in this case, so they can't make an admission against interest. The City of Cleveland is not a party. It's the City of Cleveland's record. Moreover, it's not a business record in that it's not merely counting or something of that matter, but it's actually taking statements, and then it's providing them not merely for the fact that they were said. There are lots of business records that fall under that exception and have statements. It's not just numbers, I promise you. That's true, Your Honor. But this is clear hearsay under Rule 801. They are statements that are being put forward that are unsworn, and they are being put forward to provide the truth of the matter asserted. Now, if somebody in a business record, say a meeting, made some statements, and they were recorded as part of, say, a meeting minutes, that would not be a business record that would meet the hearsay exception because it's not testimony. These are specifically statements. So this person who said this in the report, where did they get the information? This was after an investigation, I take it? Your Honor, I have no idea where they got the information because they never testified. I don't know who this person is. I've never met them. I've never met any of the people who made any statements. Some of the testimonies, right? Yes, Your Honor. Okay, so testimonies neither here nor there. There hasn't been a trial. No, but they could have given deposition. They could have given a declaration, an affidavit, or some other manner of testimony that has the reliable indicia of truthfulness, of swearing to the statement. So is there no policy that requires a report to be made once a taser has been used or discharged? You know, obviously in police forces, if there's a discharge of a weapon, there has to be a report, and that's part of what has to happen. There's no policy here that if somebody discharges a taser, there has to be a report of that made? There is a policy, Your Honor. There is a policy that must be made. Well, if there's a report that that has to be made, then pursuant to an investigation, why wouldn't that be a business record? Because it's made under some— Well, Your Honor— Don't interrupt me. I'm sorry. Made by somebody who's under a duty to make that record. Your Honor, there is a policy that when a taser is used, there must be a report. The IAU report that is being referenced is not that report. That is a different report. It is an investigation that was taken place due to the complaints of the decedent, Mr. Morbito. So it is not because a taser was used. I understand your question. I believe you, Your Honor. And I'm quite familiar with the taser policies in the city of Cleveland. And, yes, any time either a corrections officer or a police officer uses a taser, they're required to write what is called a Form 1. And a Form 1 details why a person chose to use force and all of the events surrounding it. So, yes, that record must be made. And it would be made by the individual who used the taser. So in that case, yes, it could be an admission against interest because it's the actual party making the statement. But in this case, Officers Holmes and Rauscher only made very limited statements in the IAU investigation. I don't necessarily dispute their admissibility. And, moreover, Officers Holmes and Rauscher testified about their statements in deposition. So that would even supersede the IAU report and be direct testimony offered under oath, clearly admissible. However, these other statements from the IAU report are clearly inadmissible because they are the direct definition of Federal Rule of Evidence 801A2, which I wrote down on my tab just so I knew that I would say it right. Give me a good Sixth Circuit case to look at to show that when individuals in a police department or a city are sued over excessive force and you have an internal report about it and it contains a damaging admission about one of the individual defendants, that that's not admissible under the hearsay rule. First, Your Honor, while I do believe I have a case for you, I disagree with the characterization that it's a damaging admission. Give me the case first and then we'll talk about what I'm missing. Your Honor, it's a 1992 case that we cite to all the time that specifically says policies, procedures, and internal disciplinary documents are inadmissible against officers. And I believe the name of the case is Anderson. Okay. All right. And if you permit me, I... Tell me what I'm missing. About the admission, Your Honor? I believe that none of the statements that state that it was a taser usage constitute admissions because they were all made by non-parties who are not, who allegedly were witnesses to this case. If you look in my brief, I go through it in the reply brief specifically. There's a man, a Burgos statement. I'm sorry, Your Honor, if I may just page... I just, what is it? There's that residual hearsay exception 807. You know, if it has indicators of trustworthiness and so forth. I don't believe there are any... It's the classic case. It's the city zone investigators. And if you want to go to the finality of the report, the city zone investigators find that there's no grounds for believing that he was tasered. It's pieces within the report that disagree with the city zone investigators that are pointed out to say that he was tasered. The investigation ultimately concluded there was no tasering and no violation of the department's use of force policies. So to the extent that maybe the finality would be part of the 807 exception, the finality of the report actually supports my client's position that he was not tasered and that there was no violation of these force policies. Would you argue that the finality of the report can be considered but the various steps within the report that they look at cannot be? Your Honor, I'm actually not arguing that. I'm merely taking Judge Sutton's point and trying to explain how, yes, if we're going to just let the report in for the finality, that's fine, but the finality supports us. There's no indicia these people were telling the truth when they made the statements in the IAU. Some of them were even in prison. Some of them were, I'm sorry, not prison, in jail, were other people who had been arrested for crimes. I see that my time is up, and I yield to my colleague, Mr. Nee. All right, thank you. Thank you. So Mr. Nee? Yes, Your Honor. Good morning. May it please the Court, my name is Matthew Nee. I represent Deborah Morabito. Deborah's son is Jimmy, who was the individual in the jail cell. Jimmy passed away about a month after these incidents. We haven't tried to establish a correlation between these incidences and his death, just for the record, but it does go to show the circumstances of his death go to show pretty significantly how disturbed Jimmy was. Jimmy got out of a car at night, laid down in the middle of a road, and was run over by a car. He was off his medication. He was prone to, in fact, prone isn't the right word. He was completely unable to control impulses, behavior, when he was not medicated properly. A month earlier, he had gone to his ex-girlfriend's house to return some property. There was some kind of dispute, nothing physical, but some kind of dispute going on. Her father, who was a Cleveland police officer, told him to leave. He was again off his medication. He had been in the hospital the entire night before with an IV with the flu, and he hadn't taken his medication in several days. The father called the police, had him arrested, and jailed. He was in jail at about 1 o'clock. The entire time he's in jail, he's demanding his medication, begging for his medication. He's telling everybody who will listen, I have Tourette syndrome, I have anxiety disorder, I'm bipolar, I need my medication, I can't control myself. Nobody listens. They listen, they don't hear. They don't seem to care. You'll get your medication when you get it, they say. You not having your medication is not... What about the fact he seemed to calm down quite a bit after ibuprofen and Benadryl? His behavior was erratic the entire time. Doesn't that reality suggest that it wasn't that serious a problem, if those two things would calm him down? He would calm down periodically, and it could be caused by the medication, just maybe there's a placebo effect perhaps from having some kind of medication. But his behavior was consistently erratic. And I cut against myself perhaps, but at the moment before Mr. Rauscher and Mr. Holmes enter the cell, he is. He's actually sitting on his mat by himself. I don't know about quietly. And to say that he was calm probably isn't the right description. He might have been physically calm. He was sitting on this mat. But he was still very agitated. There's no audio for this video, of course. He's prone to these verbal outbursts. He's prone to say things that he normally wouldn't say. There's very little question, if any question at all, that he suffered from these conditions. None, I think. And very little question, if any, that he required medication to manage them. What's the evidence that gives you a tribalist effect on the medical needs part? Well, the medical need, you're talking about the time after? Yeah, I mean, there's two different claims here, and I'm asking about the medical one. You have excessive force, and you have failure to provide medication and attention to his medical needs, and it seems like it's a speed pacing thing. And I'm just curious what you think the evidence is that would allow a jury to rule for you on that claim. The officers were deliberately indifferent to his medical needs is the key point. Okay, that's a great conclusion. What's the evidence that shows that? That the officers knew that he needed medication. They've testified that they knew that he needed medication. They gave him some. They gave him some, and he seemed to get better. You're calling that erratic, but they gave him some. They gave him medication that didn't treat those disorders. They gave him other medication. Right, but the officers don't have authority to do prescription drugs, right? Okay, so explain how do we? You know what I'm asking, don't you? The nurse shows up at 530. It's 730 before the incident happens, and then after that, he does get his medication. And at that point, he does calm down. In fact, I think. So is it the gap between 530 and 730? Is that going to be the point? There's a gap between the time of admission and 730. It's extremely important that 530 to the 730 point, but there's also the gap before that as well. But on the time frame, the time he came into custody, and he's asking for his medicine, and the time the nurse arrived, and I'm assuming that would have been the official who had been qualified to actually give him the required medication. Are you claiming that there was a problem, that there was a denial during that period, that first period? They did deny him medical care during that period, yes. They knew that he needed the medication. They still didn't provide him the medication. When he got the medication. But what about the fact there's not someone there that can give it? There was during that two-hour period. Which two-hour period? From 530 to 730. Okay, but I'm asking you about the period post, I mean pre-530, from 12, whatever, he came in until 530 when the nurse got there. What are you saying about the denial of medication during that period? I have to believe that there was a way that he could have gotten his medication, whether by somebody delivering it. Okay, but believing that there's a way and having the record demonstrate, those are two different things. So you're really focusing on the 530 to 730? Correct. Until the time he got his medication. 730 was the time of the incident. He didn't get his medication until after that. Okay. But, yeah. When? What's your estimate of after that? When was it? I honestly don't recall, Your Honor, when he got his medication. It was sometime after that. Not too far after that, as I understand. And at that point, I think it was Mr. Holmes said that it was like a light switch went off. He was a completely different person. As soon as he got his meds, everything was fine. I don't recall that you're contending that these officers, these defendants should have taken your client to the emergency room. They did not make that. We did not make that contention. I don't think it was. They can't prescribe medicine. Correct, Your Honor. The question as to unqualified immunity, as to the excessive force, this court has said that a defendant who files an interlocutory appeal on qualified immunity must limit the arguments to questions of law and not fact, and all the facts have to be viewed in the appellee's most favorable light. We have a video here, right? We do. We're allowed to look at the video. Absolutely, and to view the video in my client's most favorable light. What's your sense of what the video shows? The video shows my client sitting on the floor in his cell in a paper suit, alone in a highly visible area with many people walking around, not presenting any threat to himself and impossible to have it to be a threat to anybody else. There's nobody else there in the cell. There was no reason for the officers to go into the cell. Their excuses were to calm him down. He's sitting on the floor. Their excuse was to protect him. He's on suicide watch. He's not doing anything. He's sitting there quietly in a paper suit. There's no reason whatsoever to get into the cell. They decide to rush in. They rush in. The video shows them just without warning. They haven't testified. There's no warning given. We didn't warn him. They got tired of it, and they went in. They get in there, and they know this person has these disorders. They know this person. So far, you haven't said anything that would count as excessive force. So go there. What does the video show from your perspective? The play-by-play, as you interpret it, creates a tribalist effect on excessive force. Showing that the officers hit him twice in the face, mugging or slapping or punching, however you want to term it. It doesn't matter. He's hit in the face twice. You can see that on the video. You can see that in the video. You can see that in the video. And the appellants say that, well, he gurgled or he threatened to spit. Well, we have to view the evidence in my client's best light. There's no evidence in the video of him gurgling or spitting. It's due to the quality of the video, though. It is. There's not a close-up of his face. There's no audio, so you can't hear it. But, again, you have the evidence from the officers saying, oh, he gurgled and tried to spit, and you have no other evidence except for Jimmy's own statement saying, no, I didn't. I didn't try to spit. I didn't gurgle. You have witnesses, none of whom say he tried spitting at the officers. So all you have is a self-serving testimony of the officers saying, he gurgled, so we punched him in the face twice, and then we dropped him to the floor, and then we piled on top of him, and then we brandished our taser. And now we get to a point where we disagree, of course, with Jack, what happened with that taser. Jimmy says he was tasered. The witnesses said he was tasered, or several of the witnesses say he was tasered. The officers say they activated it. They brandished it and activated it. All those witnesses, is that all through the internal report, in terms of whether this is evidence we can consider? Your Honor, I guess. And you heard that. What's your take on that whole point? President sends impressions, business records. You have eyewitnesses to this who relayed their impressions of this in these reports. But why not depose them? I mean, I understand that. It is expensive. That is a consideration as well, but we feel we don't need to depose them. We have their statements. They have these business record statements of their present sense impressions. If you're allowed to use that part of the report, are they allowed to put in the final conclusions of the investigation? I would say the report as a whole is admissible, yes, and that would include the conclusions. The conclusions, however, is an interpretation of the facts. I mean, what they're saying is that there's no evidence that the taser was fired, and there's no report as to the taser being fired. But, you know, we have evidence from the witnesses and from Jimmy saying that he was. In fact, tasering probably isn't the right phraseology here. It's drive stunning. There's a difference between a drive stun and a tasering. A tasering, you know, you're used to. Stay for the next argument, and you'll learn even more about this topic. I probably will. The drive stunning is putting it up against somebody's skin, and in this case we have the taser being put up against Jimmy's neck and activated, sending a charge into him. And the video shows at this moment when this taser comes out, and this taser goes near Jimmy, you see Jimmy's leg twitch. This is the moment when he says he was tasered, drive stunned. So all this evidence shows, in my client's most favorable light, that there was no reason to go into the cell. They decided to go into the cell anyway. They punch him twice, they drop him to the floor, they pile on top of him, and they drive stun him on the floor. And then they leave. And then they leave. That's all there is to it. There's no reason for any of this force. There's no reason. They never needed to go into that cell. He wasn't a threat to himself. He wasn't a threat to anybody else. There was no reason to be there. Anything that happened in that cell was their own doing. And at that point he wasn't seeking medical attention, you would say? He wasn't constantly at every moment asking, I need my meds, I need my meds, constantly. But over the course of the time there, yes, he had made, and the officers testified in their depositions, yeah, we knew that he needed his meds. There's no question that he had these disorders and that he needed his meds. They knew that he was in that cage, in this condition. They went in for the sake of protecting him, they say. They didn't need to protect him. He was fine, he needed his meds, but he was not going to hurt himself. He was in a paper suit on a padded mat, sitting there. No reason for him to be there. No reason for him to hit him. Again, with dispute as to whether he gurgled or spit, the evidence needs to be viewed in my client's most favorable light, and in that light there is no gurgle or spit, and therefore there is no reason for him to be hit. Thank you. Thank you, Your Honor. We understand your argument. Thank you very much, we appreciate it. Thank you. I'm back for my final three. Very briefly, I'd like to address the time frame between 530 to 750. It was 750 when he finally saw the nurse. He was not the only inmate in the jail, and the nurse makes the determination of what order inmates are seen based on their conditions. It had nothing to do with either my client's Holmes nor Rauscher, and so the fact that Mr. Morabito wasn't the first person seen when the nurse got in but was seen in some order was completely the call of the only medical professional at the facility, the nurse. Do you think before a nurse is there, the only option is the hospital? Is that the way it works? That would be my understanding, Your Honor, and I have no idea nor do my clients why there wasn't a nurse on duty, that it's not something that they can control. Is there usually supposed to be a nurse 24 hours? My understanding is yes. What do you mean that's not something they can control? Aren't they in the facility responsible for its staffing? They are not responsible for the staffing. They are not at that level in the facility. There is a warden. I don't mean your clients, but obviously the, okay. Whomever was responsible for the staffing is not a party in this case, Your Honor. Okay, thanks. As to the issue of going into the cell, the record is replete with the testimony of my clients. The reason they went in the cell is Mr. Morabito continued to threaten to hurt himself and had said that he was going to smash his head against the wall, which was not padded. He had been doing that earlier on. And the unfortunate reality of Mr. Morabito's fate is that his tendency to self-harm was a very real concern, which is why my clients entered the cell to begin with. You can't enter a cell instantly. It is a locked jail cell, so they had to act quickly. That plan backfired a little bit. Well, it did because first he tried to spit on them. And while the video doesn't show whether or not he tried to spit on them, it's because there's no audio and the video is not good enough. My clients both testified that he did, and there's no evidence that can refute that. Even if you accept the statements in the IAU report, nobody else was in the cell close enough to hear a gurgle or something of that nature or to see whether his face contorted in a manner of spitting. If you're going to go in to protect him, why not wait until there's some indication that he is approaching some act of self-harm? I'm just saying you can't go in the cell immediately. A person can hit their head against a wall in an instant. I can hit my head against this thing in half a second. You guys would be quite shocked, I'm sure. But that is the reality, and you can cause serious damage to yourself. At that point, the liability switches. He was screaming, I'm going to hurt myself, I'm going to hurt myself. Why didn't you go in there and save him? Why didn't you go in there and stop him? They have a responsibility. It's a very difficult situation, and that's why qualified immunity exists, to allow the government agent discretion on these close call situations. That's Fox Vita Soto out of this court. It's not 20-20 hindsight. It's the reasonable officer at the time, given the information they had. There was no question he had serious mental disorders. They had put him in a paper suit because of concern of hanging himself, and then there was still a possibility he could smash his head against a wall. I'd like to just quickly reference in our brief that we did make a number of arguments that assuming he were tasered, it still was not excessive force. I believe that the Hagans case and the Cockrell case are the strongest ones. Thank you very much. I appreciate your time. Thanks to both of you for your helpful briefs and oral arguments. We appreciate it. The case will be submitted, and the clerk may call the last case.